BRUNSWICK REFRIGERATING CO. v. WOLF, SAYER & HELLER.

(District Court, S. D. New York. January 23, 1914.)

PATENTS ☞328—VALIDITY AND INFRINGEMENT—GAS PUMP.
　　The Whitaker patent, No. 899,583, for a gas pump, or compressor, designed chiefly for the compression of ammonia gas in ice-making or refrigerating machines, while the elements of the device are old, embodies a true combination, which was new and accomplishes an improved result, and the patent discloses invention and is valid; also *held* infringed.

In Equity. Suit by the Brunswick Refrigerating Company against Wolf, Sayer & Heller for infringement of letters patent No. 899,583, for a gas pump, issued to Richard Whitaker September 29, 1908. Decree for complainant.

Archibald Cox and Alfred M. Houghton, both of New York City, for complainant.

Hirsh & Newman, of Brooklyn, N. Y., and Max W. Zabel, of Chicago, Ill., for defendant.

MAYER, District Judge. Complainant is engaged in manufacturing machines comprising the pump of the patent, and defendant was formerly complainant's selling agent for the machines in certain territory, and as such sold a number of the machines. The agreements under which defendant acted as selling agent expired January 1, 1911. Defendant thereafter began manufacturing and selling practically identical machines.

There is really no doubt as to infringement; and in its final analysis the suit narrows down to a question of aggregation or combination. The prior art does not show any anticipation of the whole gas pump of the patent, and the record demonstrates that the machine is operatively excellent and commercially successful. This is because the machine maintains its efficiency without adjustment, and practically for substantial periods of time without wear, and is therefore practical for general use, and especially so in households, stores, and other places where a mechanic is not ordinarily to be found.

The importance of the results thus attained will be appreciated when the purposes of the machine are understood. The gas pump here under consideration is designed and used "for compressing any gas, as ammonia gas in ice-making machines."

Ice-making or refrigerating is commonly accomplished mechanically by repeated expansion and compression of ammonia gas. As the ammonia gas expands, it usually flows through coils of pipes and absorbs heat from, and thus cools, the thing in contact with the outside of the pipes, which may be the air of a refrigerating box, or ice-freezing cans, or brine to be pumped to the place where refrigeration is desired. The expanding gas, after circulating through the coils and absorbing heat from whatever surrounds them, enters the gas pump.

The gas pump is called a compressor, and is a device adapted to be connected with a source of power, and to utilize such power to compress the gas and deliver the compressed gas. The compression is accomplished by taking the gas into a cylinder, forcing the piston up towards the cylinder head, so that the gas is compressed into the diminished space, and there expelling the compressed gas, so that it may again expand in the coils and absorb heat from the body surrounding it.

The purpose, therefore, of the gas pump, is to compress an agent of a volatile, rapidly expanding nature, and in operation this must be done repeatedly at short intervals during long periods. To be successful, such a pump must meet two requirements: (1) The piston must accurately come very close to the end of the cylinder in order to get efficient compression and substantially complete discharge of the compressed gas; and (2) provision must be made for continued accuracy in order that the efficiency may be reasonably permanent.

It is obvious that the problem with which the inventor was confronted was the difficulty in preventing accuracy from being impaired

by the rapidly repeated operation under great stress through long periods and the wear which might ordinarily be looked for. A gas can be sufficiently compressed only when the two surfaces between which it is compressed, the piston and cylinder, are brought very close together in accurate relation on the upstroke of the piston. The space between the two when in this position, or the clearance (as it is called) in the machine of the patent in suit as actually constructed, is three one-thousandths of an inch, and that approximates perfect efficiency. When the clearance is increased to more than eleven one-thousandths of an inch, the efficiency begins to be materially impaired.

Further, if any gas is left in the cylinder on the down stroke of the piston, it re-expands and is "dead gas." The dead gas affects the efficiency of the machine, and the effort is to avoid dead gas by having the clearance so small that the gas is substantially completely compressed and discharged. The strains which come from the compression and from the power would ordinarily affect accuracy in a gas pump. The compression strain is upon the piston first, and other operative parts through it. The strain from the flywheel or motor is a torsional strain, and first upon the shaft.

The gas pumps of the prior art were so constructed that the compression strains on the piston fell upon a connection between the piston and rod not well adapted to withstand them, which wore away quickly, transmitting the compression strains inaccurately to a connection between the rod and shaft not well adapted to perform the duty imposed on it, which connection was further hampered in performing its functions properly and permanently by receiving also the torsional strains from the motor or power.

The old gas pumps embodied, among other things, two features of construction which may be called (a) the crank shaft, and (b) the wrist pin.

The crank shaft construction is illustrated in the patent to Hardy, No. 434,561, and also by "Complainant's Exhibit, Section Old Style Crank Shaft." I am satisfied that the crank shaft construction wears rapidly, and thus loses accuracy and efficiency of operation, and also that the parts do not travel true, because the crank shaft is called upon to withstand the thrust from the working stroke of the piston and compression strain and the torsional strain from the motor.

The wrist pin construction consists of a hole in the end of the connecting rod and a pin of steel passing through the walls of the piston and through this hole in the connecting rod. This construction presents a small bearing area which wears rapidly and unevenly. To attach the connecting rod to the piston, some part of the wrist pin must bear upon the piston. All of the wrist pin cannot contact with the piston, because some of it must be in the connecting rod. The connecting rod bears only on a portion of the pin, and the bearing area is small at one of the points on the machine where the compression strains are received.

With these difficulties in the prior art known to this inventor, he undertook the development of the machine which expresses the patent in suit. The claims of this Whitaker patent are as follows:

"1. In a gas pump: (a) The base casing constituting an oil-tight receptacle to contain lubricating oil; (b) an actuating shaft extending transversely into said receptacle; (c) an eccentric keyed on said shaft within said receptacle and having on its opposite sides integral bearing portions; (d) an eccentric strap on said eccentric; (e) a connecting rod rigid with said strap and having on its upper end an integral cylindrical transverse head; combined with (f) a cylinder removably secured to the upper end of said casing; (g) a piston within said cylinder having formed within its lower portion a transverse cylindrical bearing extending through it and adapted to receive said head; (h) said head and bearing being substantially coextensive in length with each other and the diameter of said cylinder; (i) and said casing having bearings in its opposite sides to receive the integral bearing portions of said eccentric —substantially as set forth.

"2. In a gas pump: (a) The base casing constituting an oil-tight receptacle to contain lubricating oil; (b) an actuating shaft extending transversely into said receptacle; (c) an eccentric keyed on said shaft within said receptacle and having a transverse bearing in said casing; (d) an eccentric strap on said eccentric; (e) a connecting rod integral with said strap and having on the end of its upwardly extending portion an integral cylindrical transverse head; combined with (f) a cylinder removably secured on upper end of said casing; (g) a piston within said cylinder having formed within its lower portion a transverse cylindrical bearing extending through it and adapted to receive said head; (h) said head and bearing being substantially coextensive in length with each other and with the diameter of said cylinder—substantially as set forth."

It will be noted that there are essentially only six pieces of metal: (1) The casing, which is so made as to afford an oil-tight receptacle with separate bearings for the shaft and eccentric; (2) the shaft; (3) the eccentric; (4) the piece which in itself constitutes eccentric strap, connecting rod, and transverse head; (5) the piston with the undercut slot to receive said head; and (6) the cylinder resting on the casing. There are no pins or bolts or nuts in the operating connections.

Obviously, in an art of this kind, the elements are likely to be old. It happens very frequently, in arts relating to the construction of machines, that there is no suggestion of novelty in any of the elements. In this case, for instance, a considerable number of patents (32, as I count them) have been referred to in the testimony and analyzed both upon the argument and in the brief.

It is impossible, within the limits of an opinion, to undertake to discuss the details of these references to the prior art; but the task of the court has been considerably lessened by the comforting clearness with which both counsel have set forth the constituent elements and the claimed results of these constructions of the prior art. Most of them are relevant citations, and from them it is apparent that inventors have been striving to obtain accuracy in the operation of pumps, steam engines, and numerous other kinds of machines, while at the same time reducing the effect of strains in order to decrease expense and delay caused by repairs and replacements due to wear.

The inventor was dealing with a problem thoroughly well known to those in the art, but up to his time no machine of the attributes and merit of that here under consideration had been produced by any one, either with or without a patent. The history of these letters patent, as disclosed by the file wrappers of the original patent and the divisional patents, demonstrates that the subject-matter received careful attention in the Patent Office. The inventor encountered the prior art.

and the Patent Office was careful to the extent of requiring division, which was acquiesced in.

Much is argued in regard to the proceedings in the Patent Office; but, so far as these proceedings are material, they confirm the value of the presumption of validity which attaches to the issuance of letters. This is not one of the cases where, as sometimes happens, some important reference has been overlooked; but, on the contrary, this inventor had a long road to travel before he reached his goal. In the last analysis, of course, the question is whether there is a mutual interaction of the elements stated in the two claims here in suit.

The defendant urges that these elements should be divided into two groups, one comprising the elements at one end of the connecting rod, and the other comprising the elements at the other end of that rod; the elements in each of these groups co-operating to constitute a true combination, so that there are two combinations joined by the connecting rod which is associated with both. The defendant's position is:

"While there is thus a mutual interaction of all the parts or elements mentioned in these claims, * * * it must not be assumed that a new result ensues when they act associatedly, or that any particular or more meritorious compression of gas occurs over that which would occur with an equivalent structure, or with this structure with only one equivalent element inserted."

It is not easy to determine whether this view is correct, for there is the usual sharp controversy between experts in respect of the action of a piece of machinery having elements which, generally speaking, perform well-known functions. I am inclined to think, however, that complainant on the evidence has satisfactorily shown the interaction which should exist in a case of combination, and has likewise shown that new or better result which must be found in order to sustain a case of combination.

But, if there is any doubt, that doubt must be resolved in accordance with valuable and well-settled principles; for here the presumption of patentable novelty and the utility of the machine will resolve such doubt. As Judge McPherson said in Standard Plunger Co. v. Stokes (D. C.) 196 Fed. at page 47.

"It is true that the line between a combination and an aggregation is not always easy to draw, and it is also true that the case before us may lie within the twilight zone; but the balance of my judgment is in favor of the patent. The device has proved to be useful. It is an obvious advance on any previous arrangement of signals and motor. * * * These solid advantages are well established, and, as I think, are enough to decide the dispute."

In the case at bar the best tribute to the machine made under these letters patent is that the defendant, which was the agent of complainant, is using an infringing device. I am of opinion that the patent is valid and infringed.

The complainant may have the usual decree. Settle on five days' notice.